With that, I think we're ready to start with the first case, which is Kinsey v. The New York Times Company. Great. Good morning, Madam Chief Judge and Judges Cabranes and Lynch. This is Barry Coburn. And I represent the appellant, Mr. Kinsey, and with the court's permission, I'd like to reserve one minute for rebuttal. Yes, go ahead. Thank you so much. May it please the court, we have two principal issues in this appeal, and we assign essentially equal significance, equal importance to each of them. And they are the applicability of the Fair Report Act, and the the doctrine of choice of law. And so with respect to the Fair Report Act, if I could just start there, the district court in this case concluded that a reasonable reader reading the article in question could have, you know, would have concluded, would have inferred, although everyone agrees that it doesn't state so explicitly, but would have inferred or understood that the reference for the Ruhlman Declaration meant that the declaration was in fact filed in the Rodriguez Costs case. When this case is viewed from the perspective, which in our view, it has to be viewed from, which is, this is in the context of a motion to dismiss. The burden is on, it's an affirmative defense, that is to say, the invocation of the Fair Report Act, the burden is on the entity invoking it, which is the New York Times. When those, you know, basic principles are applied here, it's our view that that conclusion, which was reached as a matter of law by the district court, simply is not reconcilable with the article itself. And we went through, as we said in our, both of our briefs and also below, we went through a detailed parsing of the article, much more so, frankly, than the Times did, to try to demonstrate that no reasonable reader examining this article would or could have concluded that the document in question was in fact filed in the underlying case. And we, of course, concede it was filed there, but that doesn't matter, as the Dameron case notes, that just doesn't matter in the context of Fair Report Act analysis. So no reasonable reader could have reached that conclusion, and, you know, we set that forth in detail in our brief. It could have been filed in two death penalty cases that are mentioned in the DOJ management review, in the Inspector General's investigation, in the complaint process, as Tenbrook utilized in the appeal of Mr. Kinsey's personnel action, or most fundamentally, nowhere at all, because declarations are developed and signed and utilized in all kinds of non-litigative contexts. And the article never says where, if anywhere, the declaration was filed. And hence, based on all the cases we cited, cited Adelson and a whole variety of others, it's our view that the act, at least in the context of a motion to dismiss, just cannot apply. And so then, turning very quickly, if I could, to the question of choice of law, we think the Condit case essentially says what needs to be said with respect to choice of law. Everyone, both parties agree in this case that the New York's interest analysis applies in terms of which jurisdictions law should be utilized in this case. We all agree that the act in question is conduct regulating, or rather, the doctrine in question is conduct regulating. And so, you know, looking at the Condit case just makes it as clear as it could be from our standpoint. I mean, the Condit case, really, in most respects, or virtually all respects, is on all fours with the facts that we have here. There, as here, the communication, the defamatory content emanated from New York, from a New York media outlet. Similar arguments were made in Condit to the effect of, you know, that New York has a particular policy interest with respect to protecting its media outlets from unwarranted defamation actions. And in Condit, the most critical fact, and the fact that the Times, in our view, doesn't correctly construe, is that what was at issue in Condit, and the reason that ultimately the analysis meant that California law would apply in that case, that was not because, and this is probably the most single critical thing here, it was not because of Condit's domicile, which was in California, but it was because his workplace is in California, and the Condit opinion makes this just as clear as it could possibly make it. It speaks very specifically. Excuse me, Mr. Coburn, didn't we say in Arrokim that, in talking about the judicial proceeding privilege, that that privilege would lose its force if we didn't look to the law of the locus state, and applied the place of injury instead? And why wouldn't that analysis reach the same result in this case, where a different privilege applies, but a privilege? Well, I mean, there's no doubt in our minds that there is some interest that New York has in applying its own privileges, and certainly applying the Fair Report Act as codified in New York state law. We're not suggesting for a minute that there is no interest there, but when one takes all the relevant interests as a whole, and factors them one against the other, which is what we understand that the interest analysis requires, I mean, here you have very similar to what existed in Condit. Well, excuse me, Mr. Coburn, this is Judge Lynch. Before you go on with Condit again, Condit was a district court case, right? You're correct, Your Honor. So it's not binding on us. I mean, it may be persuasive, it may be interesting, it may be helpful, and we may agree with it, but we're not bound by it, is that right? That is right. You're not bound by it, and it is a district court case, but of course it invokes a great deal of the law that this court has handed down over a good number of years. And we think, just as Your Honor just said, we think it's highly persuasive, and we think that Condit parses that law correctly. I mean, here- May I ask another question? You said everyone agrees it's a conduct-regulating rule, and I would have thought, and I certainly acknowledge this is a rather naive perception, and maybe not the way the case is interpreted, but wouldn't a conduct-regulating rule look to the place where the conduct occurs? Well, it's- I think the key question here is just sort of where does the conduct occur? In other words- Well, excuse me, let me try to make it more pointed. The idea of a conduct-regulating rule in the simplest case, right? If there's a car crash in Pennsylvania between a New York driver and an Ohio driver, we look to the law of Pennsylvania to decide whether the person was speeding or not. It would be ridiculous to say, well, it wouldn't have been speeding back in New York or something like that. But so the idea is to tell people what they should look to to decide what to do. And it seems to me the people who are deciding what to do here are the editors and publishers of the New York Times deciding whether it's- what privilege they have or whether they could expose themselves to liability. So why shouldn't they be able to look to the law of their jurisdiction to govern their conduct? Because, Your Honor, there is a critical distinction that's drawn in the cases, and I don't just mean conduct here. I believe it's drawn in the Adelson case and a variety of other cases between, for example, an automobile case versus a defamation case in which the defamatory content was disseminated nationally. And I think that goes directly to the question that Your Honor just posed in terms of what's the locus state? Where did the tort occur? Our view is that the locus- that it's patently clear, maybe that's overstating a little, but it's quite clear in our view that the locus state here, you know, I mean, no one disagrees with the proposition that the content in the New York Times is disseminated nationally. And in our view, most particularly disseminated in the District of Columbia. So what should the New York Times do then when a reporter says, here's my article, and they're deciding whether to publish and what their risks are? Look to the jurisdiction with the- that has any conceivable relevance that has the least generous privilege? Well, I don't know. In the abstract, I understand precisely, I think Your Honor's point, but I mean, in practical terms, you know, the rules here are largely the same. I mean, there is a qualified privilege under, you know, the Fair Report Doctrine in the District of Columbia. And there is an absolute privilege, or at least arguably an absolute privilege in New York. But either way, I mean, all the New York Times had to do here was to, you know, explicitly tie the document in question that contained the defamatory information to the official- to the underlying official proceeding. They would have been fine in both jurisdictions, and in fact, in every jurisdiction, as far as I know. Okay. And finally, Mr. Coburn, this will be my last question, and it goes back to your first point. You do certainly cite a lot of cases that say that the privilege only applies when there's a particular proceeding identified. But I'm not- I don't know if we have cases quite like the hypothetical I'm going to offer, and let me ask you what you think about it. Suppose a reporter writes an article saying that a Hollywood producer has been sued in multiple courts by multiple employees alleging sexual harassment, and says in one of them the plaintiff alleges that he did X, Y, Z, accurately quoting the complaint in that case. And in another, a witness testified that she saw him do A, B, C, again, accurately quoting testimony the witness gave. Are you saying that's not within the privilege because the reporter did not identify the specific name of the case in each instance? Absolutely not. So long as it's- if I understood your Honor's hypothetical correctly, it sounds like all of that content is actually in the complaint itself. And if the reporter- No, no, no. I'm saying there are two different cases. In one case- Okay. And the reporter says in one case the plaintiff alleges in the complaint A, B, C, in another case a witness testified X, Y, Z, but doesn't say which declaration or which witness- witness and testimony or which allegation came from which case. I- and forgive me for misunderstanding initially, but my answer is, first of all, that's a much closer question. And secondly, no, I don't think the same argument would apply given your Honor's hypothetical. And it's for the following reason. Under either scenario, in other words, without knowing precisely which of the two complaints, you know, the particular allegation in question related to, there's no ambiguity about the proposition that it relates to one complaint or the other. Here we don't have that. Well, I mean- All right. So- But excuse me, again, is the issue that what we don't have is that it might not be in a court case at all, not a question of which court case it's in? Well, I think it's both, actually. I mean, I don't- without quibbling in terms of, you know, whether or not that long, you know, list of other proceedings that are referenced in the article all qualify as official proceedings, I mean, if it were- if you could- if you knew for a fact that the declaration had been filed in one official proceeding or another, I think that would be a somewhat closer question than the one we have now. But it's an absolutely critical fact from our standpoint that a declaration doesn't have to be filed anywhere. It doesn't have to be part of any official proceedings, absolutely no requirement. The Times could have asked Woolman for a declaration itself or anyone else could have, or he could have filed it, you know, as part of the job application or for any other reason. And there's simply nothing in the article contra-indicating any inference like that. And hence, I think that's a fundamental difference, you know, versus hypothetically you're unopposed. Thank you. Judge Cabranes, do you have any questions? Thank you so much. Yeah, I have a threshold- a simple threshold question. Can I be heard? Yes. Yes, Your Honor. Oh, thank you very much. Mr. Coburn, I have a simple threshold inquiry on choice of law. Interest analysis includes some consideration of the jurisdiction in which the lawsuit is brought, right? Right. That is, that is the jurisdiction in which the action was brought is one of several factors to be considered by a court trying to determine the applicable substance of law, right? It is to be considered, Your Honor, but we, as we understand the cases, it's a relatively minor factor and typically not dispositive as it was not incandescent. So, I understand, I understand, but it is one of the factors, right? It, it, I can't, I can't tell Your Honor that it's, it's utterly irrelevant, but it seems like a relatively minor one as interest analysis typically is applied. And maybe, maybe my next question is, is irrelevant or not particularly interesting, but let me ask you, you could have brought this action in Maryland or the District of Columbia, right? Right. So, I, I ask a simple, a very simple question and perhaps it's none of my business as a judge as opposed to your business as an advocate. Why did you bring this action in Maryland or the District of Columbia? No, I think it's a very interesting question and I appreciate Your Honor posing it. And the reason is because, I mean, we, we made a, what we thought was a pretty careful study of, you know, the, all the underlying doctrines, the Fair Report Act and in particular, the way, you know, public officials, you know, in other words, whether or not the malice requirement applies in the context of New York Times v. Sullivan and so on. We looked at that in all three of those jurisdictions that Your Honor just referenced and when we, when we parsed all those factors and tried to figure out where are, you know, the points of risk might be in terms of being thrown out on a motion to dismiss or on summary judgment, we concluded that the law was best developed and, and, and we thought we could work best with it in New York versus the other two. All right. Thank you. Thank you, Mr. Coburn. We'll hear from you. Thank you so much. Good morning, Your Honors. May it please the Court. My name is Dana Green appearing on behalf of the New York Times and with me is my colleague Alexandra Settlemyer. Your Honors, the district court correctly concluded that this case presents a straightforward application of the fair report privilege. Ms. Penner was doing exactly what the fair report privilege is designed to do. She was reporting on allegations of wrongdoing in a federal lawsuit against senior officials in the Department of Justice. There's only a single phrase at issue in this case, and that is a direct quote from a sworn declaration filed in federal court. There's no dispute about the fact, as a matter of fact, that it was filed in that federal lawsuit. There's no dispute about where these words came from. It's a direct quote, and the online version actually published an image of the declaration itself. Mr. Kinsey is, is complicating matters by trying to claim that the district court applied the wrong state's law, and, and that's wrong, and I'll set that out in a moment, but I want to be very clear, whether D.C. law, or New York law, or Maryland, for that matter, applies, the outcome here is the same. None of those states would subject the Times to liability for accurately quoting and attributing that quote to a declaration that was, in fact, filed in federal court, and even if Mr. Kinsey could overcome that fair report privilege, his complaint fails adequately to plead actual malice as a matter of law, and as a public official, he must meet that pleading requirement, and on that alternative basis, dismissal also should be affirmed. So if we begin with the choice of law, I think, as Mr. Coburn emphasized, we generally agree on what the standard is that should be applied here. We disagree, however, on the way that those factors should be considered and weighted, and that is that the state with the most significant interest in the specific issue, which in this case is the point of conflict, is the fair report privilege, that state's law should apply, and ordinarily, the presumption would be for the plaintiff's domicile to be a heavy factor in that multi-factor analysis. In a multi-state defamation, such as this one, where speech is disseminated nationally, courts in this jurisdiction and elsewhere have acknowledged that, as your honors noted, unlike a car crash, a multi-factor analysis is required because it is not entirely clear where the locus of the tort is. In that multi-factor analysis, the court considered five factors. The domicile normally would carry the most weight, but here, Maryland, Mr. Kinsey argues against it, and the court felt that that factor weighed in favor of the New York Times. And again, where the defamation emanated from? New York. The law, the forum state, New York, and most importantly, the policy interests at stake here, and those policy interests, the court noted, in the context of defamation carry special weight, that New York has a strong interest in regulating the conduct of the press who are in this state, and as courts in this jurisdiction repeatedly have emphasized, that is a weighty interest. And when it is overcome, in the cases that many of them that Mr. Coburn has cited, in all of those cases, the law that ultimately was applied was the law of the plaintiff's domicile, whether that's- Can I just ask, in a nationally published defamation case such as this one, does it make any difference at all where the reporting took place? I mean, should we just look to New York because the publisher has to make a decision in weighing the privilege factor and the policies behind giving some clarity to the actor as to how he or she should behave? Is it just irrelevant where the investigative work itself took place? I wouldn't go so far, Your Honor, to say it's irrelevant. It, you know, there are many factors that can be at issue, and I wouldn't go so far as to say that it's not one that can be taken into consideration. But I want to be clear that while Ms. Benner was, you know, is based in our D.C. Bureau and was conducting work there, the ultimate choice of whether or not to publish doesn't reside with her, it resides with the New York Times, which is incorporated and based in New York. And so, you know, if you look at cases like Matchelder, the courts acknowledge and take into consideration the reporting activities, but of greater importance to the applicable law because it would regulate the conduct of the ultimate decider here. To borrow a phrase, the decider is the New York Times based in New York. Ms. Green, this is Judge Lynch. The choice of law issue is fascinating in part because interest analysis is notoriously malleable, and one can argue for almost anything, I suppose. But can I get back to the substance? Both of you, interestingly enough, think that you win under the law of any of these jurisdictions. So let me get back to the fair reporting privilege. I certainly understand the argument that a reasonable reader might well attribute this declaration to the Rodriguez lawsuit. That's how I read the article myself. But I'm fairly sophisticated, both about law and about the structure of writing and things like that. Don't you have to argue that any reasonable reader must have attributed it that way in the proceeding stage? No, Your Honor. I don't think that the cases, even those cited by Mr. Kinsey, actually support that. In fact, they repeatedly emphasize that an attenuated relationship to a proceeding is sufficient, but it would undermine the privilege to require a publication to tie every allegation to a specific lawsuit or record, that what is required is some perceptible connection. And that the privilege fails if there is no connection to an investigation or document or record, or it would be impossible for an average reader to make that connection. And what's your best case for that proposition? I think you could look to, for example, in fine, it is an overlap case, but Mr. Kinsey relies on it and that there must be some perceptible connection between the challenge report and the proceeding. I think that the Cummings case is perhaps the most robust application of the fair report privilege, where they emphasize that this should be viewed in the context of the reporting as a whole. That in that case, there was an investigation by the Department of Education, and the reporting itself does not always make clear whether it is quoting from interviews or from statements actually made in that proceeding. And yet the court finds that as a whole, it is very clear that the reporting is... And just to be clear, Ms. Green, fine and Cummings, like the Condit case that Mr. Coburn is fond of, are district court cases. That's correct, Your Honor. So are we... I guess I won't ask you if we are going to refer this as a substantive matter to a state court, state bias court to tell us what the answer is under their law. We'd have to decide which state, but is there any governing authority or are we more or less free to read these various opinions of learned district judges and decide which ones we think are more persuasive? Your Honor, I'm afraid I don't have a good citation for you from the Second Circuit. But I would say the overwhelming weight of the persuasive authority is that it must be an attenuated relationship, some indication that a reader could make that connection. Okay, I hear you. Thank you. And may I also say that whether, to your point about whether DC or New York law applies, I would just direct your honors to the Dameron case in DC, which emphasizes the tenuousness with which the connection can be made, that that is sufficient, that the overall context just has to show that it is drawing upon or otherwise quoting or paraphrasing some official record. And if only fail, if the reader would not realize that any report or official proceeding was being described. So again, whether it's DC or New York law, it's a very liberal standard. Judge Cabranes, did you have any? I'm sorry. Judge Cabranes, did you have any questions? No, thank you very much. Please continue, Ms. Green. If I may, your honors, just in the time left to me, I want to reach the actual malice points. The district court, it was not the focus of the district court's analysis. That was on the fair report privilege. But it is, of course, an important alternative ground. And for DC law to apply, it would also be an element in that analysis. Mr. Kinsey has argued that actual malice exists here on four grounds. And he hangs his hat primarily on two things. First, that the Woolman Declaration was patently unreliable and Ms. Senner should have investigated it. And apparently, he suggests that there would have been contrary information because the Woolman Declaration has a mistake or error regarding the fact that he is a third-year law student or was a third-year law student. He's now an Army JAG. And that this vague reference to other materials, which somehow would have refuted the notion that Mr. Kinsey's conduct was unwelcome. He also suggests that Ms. Senner has a preconceived narrative because she has previously reported on sexual harassment. And apparently, they had a phone conversation in which she became irritated. And none of that would adequately establish actual malice. Becoming irritated at a phone call does not constitute actual malice. Bureau discusses that from this court. The preconceived narrative, if reporting on a subject matter previously constituted actual malice, no reporter would be able to have a veto. Actual malice would always exist. And as for the Woolman Declaration, even though we are now on appeal and have been through two rounds of briefing, Mr. Kinsey has yet to actually produce or point us to his contradictory information. In contrast, the records that Ms. Senner was reporting on, even those included in the article, I think, amply demonstrate why she had every reason to think that the Woolman Declaration was reliable. We're talking about a section of DOJ that had had a dozen complaints about it, repeated allegations of a sexualized culture. The other memos that she cites, from which are all official records, indicates that Mr. Kinsey was groping the intern in a cab, that he tried to coerce her into a hotel. Ms. Tenbrook herself spoke to Ms. Senner and said that she did not dispute these accounts. None of this information would have caused her to doubt or seriously question the truth of this allegation. This is hardly information indicative of a consensual and welcoming encounter. If your Honour have no further questions, I will end there. We'll hear rebuttal. Mr. Coburn? Thank you so much, Madam Chief Judge. So it probably will come as no surprise to the panel that I agree with the proposition that was in Judge Lynch's question to the effect that in the pleading stage, in the context of a motion to dismiss and evaluating an affirmative defense, that any reasonable reader must have attributed to the Rodriguez-Haas case, the document in question. I think that's what the law says. I think when the Times cites Dameron with respect to the tenuousness proposition, that's a whole different kind of tenuousness. This is not a case in which we're talking about, like, is it an official proceeding or is the citation to the document sufficiently verbatim? Those are the areas in which the Fair Report Act, the Fair Report Doctrine, quite properly are viewed broadly and that the Times or other journalistic entities are not held to some sort of a verbatim standard. But here, we have a much wider line. I guess I'm not seeing the—I think there's a pretty close connection when I look at this article. So tell me what I'm missing. I mean, there's—the sentence is admittedly some paragraphs away from where the Woolman Declaration is first alluded to, but you got a paragraph that identifies the Connecticut suit, the topic sentence of the next paragraph, seven men and women from the unit filed declarations in her support. And then there is a reference to the Woolman Declaration later in the article. Wouldn't a reasonable reader assume that this is one of the seven declarations? I don't think so, Your Honor. I mean, what you have basically—and we, you know, like I said in our briefing, and really kind of probably a compulsive excruciating detail— Well, Mr. Coburn, maybe that's not the best way to do it in the sense that we're looking at this in the overall context and not perhaps word by word. But if you want to do word by word, what do you make of the word his? That is to say, the sentence about—Woolman says, in his declaration, which presumes that this is a declaration that's somehow been referred to earlier, or at least that is being contrasted with other people's declarations. Why would anyone think that this is a declaration, for example, as you suggested, that Mr. Woolman created at the request of the reporter and handed to her? Well, contextually, I don't regard the word his as referring to, you know, the reference to the Rodriguez-Cost case and the declarations filed in that, you know, multiple, multiple paragraphs prior. I mean— Are there other declarations referenced in the article that do not come from Rodriguez-Cost? I don't think so, Your Honor. I don't think there are other declarations referenced that don't come from Rodriguez-Cost. Is the word declaration used in the article in reference to any other lawsuit or any other in attempting to corroborate or confirm or deny some of the allegations that are made in other declarations in Rodriguez-Cost? No, Your Honor. I don't think it is, but from our standpoint, that's in no way determinative of the outcome here because, you know, declarations, despite the fact—and I—you know, despite the concession I just made in terms of the word declaration, the fact of the matter is that any declaration can be filed in any action or no action, and the article refers to, you know, at least like a half a dozen different pieces of litigation in which it could have been filed, and it could have been filed nowhere. I mean— But it refers to other— It refers to other proceedings, but the only context in which it uses declarations is in connection with this one lawsuit, so far as I could tell. Well, that could very well be, Your Honor, and I probably can't read the whole thing carefully enough right now to give you a definitive answer to that question, but I— taking Your Honor's point, I mean, the fact that, you know, the article uses the word declaration, you know, kind of—let's say it only uses it in the context of referring to Rodriguez-Cost, that in no way excludes, you know, the very reasonable possibility that it was filed in one of the other contested matters that are listed in the article or nowhere. I mean, and given that fact, and I think it's an incontestable fact, I just don't see how, you know, certainly the policy interest underlying the Fair Report Act or, you know, the Verbatim Act itself or the way it's been interpreted in the litany of cases we refer to could possibly immunize that reference, because, you know, look, I mean, to take Judge Lynch's point in response to one of his questions to The Times' counsel, you know, certainly, I mean, you know, one might read the article and say there's, like, a reasonable possibility it was filed in Rodriguez-Cost because, like, you know, like you said, I mean, you know, it refers to other declarations. It's a reasonable possibility, but it's also a reasonable possibility it was filed anywhere else or nowhere else, and so given that possibility and the fact that The Times does nothing in the article to extinguish it—in particular, there was a reference to the image in there—it's a partial image that shows no file stamp or anything like that. It's just an image of, you know, like the particular sentence in question. I mean, that doesn't confer absolute immunity in the context of a motion to dismiss evaluating an affirmative defense. That is just too close, too ambiguous for the court to, you know, throw the case out at the pleading stage based on that doctrine, in our view. And the other point I would make with whatever time I might have remaining, if I may, is just that with respect to the second issue, the issue of choice of law, you know, there are just a litany of factors, and most importantly, where the plaintiff suffered the greatest injury is the one which is—and, of course, I admit it's just persuasive authority, but it is very persuasively and eloquently articulated in Condit, you know, talking about the fact that he's a California representative, you know, his office is in California. The electorate that he represents is in California. That is just precisely analogous to what we have with respect to Mr. Kinsey working at the Department of Justice in Washington, and just as that was dispositive in Condit, we submit that it should be here. Thank you very much, Mr. Pilgrim, and we'll take the matter under advisement. Very, very well argued by both sides.  Thank you, Your Honor.